STATE OF MINNESOTA

IN SUPREME COURT

A23-0061

Tax Court                                                              Thissen, J.
                                                    Took no part, Hennesy, Gaïtas, JJ.

Renee Vasko,

                    Relator,

vs.                                                         Filed:  August 21, 2024
                                                           Office of Appellate Courts

County of McLeod,

                    Respondent.

_____

Renee Vasko, Lester Prairie, Minnesota, pro se.

Ryan Hansch, McLeod County Attorney, Steven R. Ott, Assistant County Attorney, Glencoe, Minnesota, for respondent.

_____

S Y L L A B U S

1.      The tax court properly placed on the taxpayer the ultimate burden of proving that revocation of a homestead classification was unlawful and that the assessed value of the property was incorrect.

2.      The tax court did not clearly err in finding that McLeod County had properly revoked the property's homestead classification.

1

3.      The tax court did not clearly err in upholding McLeod County's assessment of the taxpayer's property.

Affirmed.

O P I N I O N

THISSEN, Justice.

Relator Renee Vasko challenges her property tax assessment on two grounds: (1) the homestead classification should not have been revoked, and (2) the property valuation was too high. In 2018, respondent McLeod County (the County) sent a homestead application to relator Renee Vasko at her property address in Lester Prairie (the property), but the application was returned as undeliverable. The County contacted the City of Lester Prairie (the City) and learned that there had been no measurable water use at the property since 2016. On July 16, 2018, the McLeod County Assessor's Office revoked the homestead designation effective January 2, 2019 (the assessment date for the 2019 tax year). Vasko initiated this case in tax court, challenging the decision to revoke the homestead classification for the property for the 2019 tax year and the property's assessed value of $110,100.

Before the tax court, Vasko presented several pieces of evidence purporting to establish occupancy and use of the property for purposes of the homestead classification. To dispute the County's valuation of the property, Vasko offered the County's valuations of five other properties in the City as evidence that her home was overvalued. The tax court concluded that Vasko and her son had not "occupied and used [the property] for the purposes of a homestead" during 2019, as required by Minn. Stat. § 273.124, subd. 1(a)

2

(2022). The tax court also held that Vasko had not presented sufficient evidence to rebut the presumptive validity of the County's valuation of the property. We affirm the decision of the tax court.

## FACTS

In 2004, Vasko bought the property at issue. The property is located in Lester Prairie. At some point after purchasing the property, Vasko and her son lived there and were granted a homestead classification.[1] In 2014, Vasko bought a residential property in the town of Biscay which is also in McLeod County. Vasko provides in-home care services and travels extensively for work.

Vasko had ongoing disputes with the City regarding garbage services at the Lester Prairie property. In 2015, she sent a note to the City asking to cancel her garbage service. The City replied with a message stating that Vasko's garbage service would not be cancelled because she was still using the service.

In 2018, the McLeod County Assessor's Office sent a homestead application to Vasko at the Lester Prairie property's address. The application was returned as undeliverable. On July 16, 2018, the McLeod County Assessor's Office revoked the homestead designation, effective on the January 2, 2019, assessment date. It based this decision on the following facts: (i) the application had been returned as undeliverable; (ii) the post office indicated that Vasko's box associated with the property had been closed;

---

[1] The homestead classification applies to "[r]esidential real estate that is occupied and used for the purposes of a homestead by its owner, who must be a Minnesota resident." Minn. Stat. § 273.124, subd. 1(a).

and (iii) according to the City, there had been no measurable water usage at the property since 2016. McLeod County assessed the property at $110,100 as of the January 2, 2019, assessment date.

According to city water records, there was no *appreciable* water usage at the subject property for all of 2019. But that does not mean no water was used at the property. The City of Lester Prairie water metering system measures, and thus bills, for each 1,000 gallons of water used. The water metering system cannot detect 999 gallons or less of water used. City representatives, however, testified that the average adult in Lester Prairie uses approximately 2,000 gallons of water per month.

On May 21, 2020, Vasko initiated this case before the tax court by filing a petition pursuant to Minn. Stat. § 278.01 (2022). At trial, Vasko introduced 24 pieces of mail—most of them addressed to the property—to show that she was receiving mail at the property. Under cross-examination, Vasko admitted that all of these pieces of mail were actually routed to her post office box because there is no mailbox at the property. Vasko and the County introduced correspondence from 2015 regarding Vasko's failed attempt to cancel garbage service at the property.

The County introduced utility records showing no measurable water use at the property since 2016. Vasko testified that (i) the water was shut off for prolonged periods of time, but she still lived at the property without water, and (ii) she uses very little water (only 1,000 gallons every few months when she is home full time).

Also introduced into evidence were three letters from Vasko's attorneys.[2]  In a letter dated September 12, 2018, Vasko's attorney states that Vasko moved to a new house in 2014 and that the property had been vacant since then.  A second letter, dated eight days later, was not received by the City.  That letter retracts the statements of the first letter, stating that Vasko still lives at the property.  Finally, in a letter dated January 3, 2020, Vasko's attorney asked the County to reconsider the revocation of the homestead classification.  In the letter, the attorney asserted that Vasko still lives at the property.  The third letter also states that energy bills from October 2018 were included with the letter.  Energy bills matching that description were not introduced into evidence.

Vasko also provided a post office change-of-address form from 2018, a copy of her driver's license, and a notarized statement from her son that he lived at the property.  Vasko testified at trial, as did the city clerk and one of the county assessors.  The county assessor testified that she believed the property was vacant because "[w]hen I'm out doing my quarters, whether it's in the wintertime doing permits when there's snow on the ground, nothing moved, I noticed no change.  There may have been some tire prints in the driveway, but there [were] never footprints going to the house."

The tax court found that Vasko overcame the prima facie validity of the County's non-homestead classification with her testimony that she and her son lived at the subject property in 2019 and so allowed Vasko to proceed to trial.  *Vasko v. County of McLeod*, No. 43-CV-20-723, 2022 WL 17747905, at \*3 (Minn. T.C. Dec. 15, 2022).  The tax court

---

[2]     The law firm that drafted letters on Vasko's behalf did not represent her before the tax court and does not represent her before this court.

ultimately concluded, however, that Vasko did not carry her burden to show that she or her son "occupied or used the subject property in any appreciable manner during 2019." *Id.* at *4.

As to the assessed value of the property, Vasko submitted county tax assessments for five other properties in Lester Prairie. On cross-examination, she admitted that she had never been inside these homes and did not have personal knowledge of their dimensions, age, or condition. She also admitted that she did not "have any information to determine whether or not the market value of these other properties . . . [were] fair in relation to [her] own property tax values." She submitted links to real estate websites for six properties in Lester Prairie, but only one of those properties had been sold in the seven years before trial. Vasko never explained why that property is comparable to the property at the center of this dispute. The tax court concluded that Vasko "did not submit sufficient credible evidence to rebut the prima facie validity of the County's estimated market value of the subject property as of January 2, 2019."[3] *Id.* at *1.

Vasko filed a petition for a writ of certiorari seeking review of the tax court's decision, which we issued. Minn. Stat. § 271.10 (2022); Minn. R. Civ. App. P. 116.01.

---

[3]     Before the tax court, Vasko also challenged a special assessment levied against the property by the County. The tax court determined that it lacked subject matter jurisdiction over this claim. *See* Minn. Stat. § 429.081 (2022) (providing that "[w]ithin 30 days after the adoption of the assessment, any person aggrieved . . . may appeal to the district court" and that "[t]his section provides the exclusive method of appeal from a special assessment"). Vasko did not raise this issue on appeal.

**ANALYSIS**

Our review of tax court decisions is limited to determining whether the court had jurisdiction, whether its decision was justified by the evidence and in conformity with the law, or whether it committed any other error of law. Minn. Stat. § 271.10, subd. 1. Legal determinations by the tax court are reviewed de novo. *Minn. Energy Res. Corp. v. Comm'r of Revenue*, 909 N.W.2d 569, 572 (Minn. 2018). But factual findings and market value determinations are reviewed under a clearly erroneous standard. *Id.* (market value determinations); *S. Minn. Beet Sugar Coop. v. County of Renville*, 737 N.W.2d 545, 551 (Minn. 2007) (factual findings).

I.

We start by observing that the tax court applied the correct standard of proof when considering Vasko's claims. The tax court started by presuming that "the order of the commissioner or the appropriate unit of government in every case shall be prima facie valid." *See* Minn. Stat. § 271.06, subd. 6 (2022); *see also* Minn. Stat. § 272.06 (2022) (providing that an assessment is "presumed to be legal until the contrary is affirmatively shown"); *S. Minn. Beet Sugar Coop.*, 737 N.W.2d at 557 n.11 (noting that section 271.06 applies to the tax court generally and section 272.06 is specific to property taxes and that, in a dispute over a property tax assessment, "the statutes operate in the same way"). Next, the tax court assessed whether Vasko had presented "substantial evidence" that the government's decision—revocation of the homestead classification and the assessed value of the property—was incorrect. *See Conga Corp. v. Comm'r of Revenue*, 868 N.W.2d 41, 53 (Minn. 2015).

For the homestead status issue, because the tax court determined that Vasko presented substantial evidence that the County's decision revoking the homestead status of the property was incorrect, it found "that Ms. Vasko overcame the prima facie validity of the County's non-homestead classification." *Vasko*, 2022 WL 17747905, at *3. It then correctly considered the evidence presented by both parties "as if the presumption had never existed." *Id.* (quoting *Conga Corp.*, 868 N.W.2d at 53); *see* Minn. R. Evid. 301 comm. cmt.—1977. The tax court also recognized, however, that Vasko continues to bear the burden of proof in the proceeding by a preponderance of the evidence. *See Conga Corp.*, 868 N.W.2d at 53; *see also Harmon v. Comm'r of Revenue*, 894 N.W.2d 155, 159 (Minn. 2017) (stating that "the taxpayer retain the burden of proof throughout the proceeding"); *Minn. Energy Res. Corp.*, 909 N.W.2d at 573 (stating that the burden is the preponderance of the evidence).[4] Concerning the assessed value of the property, the tax court concluded that Vasko did not present "substantial evidence" that the assessed value was incorrect, so it dismissed the claim. *Vasko*, 2022 WL 17747905, at *5; *see Conga Corp.*, 868 N.W.2d at 53 (stating that the tax court may dismiss a petition if a taxpayer fails to introduce "substantial evidence" that the government's decision is incorrect).

---

[4] Vasko does not challenge the legal standard put forth by the tax court. The tax court has previously stated that there is a "presumption that once [one] obtain[s] homestead status it remains until the property is sold or the owner no longer uses it as a home." *Sayles v. County of Cottonwood*, No. 17-CV-08-282, 2009 WL 4035666, at *5 (Minn. T.C. Nov. 20, 2009) (citing Minn. Stat. § 273.124, subd. 13(e) (2022)). The core of this dispute is whether Vasko still uses the property as her home. If Vasko is not using the property as her home, the presumption is inapplicable. Because we conclude that Vasko is not using the property as her home, even under the tax court's *Sayles* rule, the precondition for the presumption does not exist.

8

Having determined that the tax court applied the correct standard of proof when considering Vasko's claims challenging the property's homestead status and valuation, we turn next to whether the tax court clearly erred in its factual findings and market value determinations on those issues.

## II.

Turning first to the homestead issue, Minnesota Statutes section 273.124, subdivision 1(a), provides that "[r]esidential real estate that is occupied and used for the purposes of a homestead by its owner, who must be a Minnesota resident, is a residential homestead." We have not previously addressed the test for receiving a homestead classification. The tax court has previously explained that the statute sets forth four requirements for homestead classification: "1) the taxpayer must be the owner; 2) the Subject Property must be residential real estate; 3) the Subject Property must be occupied and used by the owner for the purposes of a homestead; and 4) the owner of the Subject Property must be a Minnesota resident." *Aanenson v. County of Murray*, No. C9-01-63, 2002 WL 1988199, at *2 (Minn. T.C. Aug. 22, 2002) (citation omitted). Neither party disputes that this is the proper test and we apply that test here.

That the first, second, and fourth elements of this test are met is not in dispute; Vasko owns the property, the property is residential, and Vasko is a Minnesota resident. The only element of the four-part test in dispute is whether, during 2019,[5] Vasko "occupied

---

[5] Properties are assessed based on their value and classification on January 2 of the tax year in question. Minn. Stat. § 273.01 (2022). If a property is not used as a homestead on January 2 but is used as a homestead by December 31 of the same year, the property

9

and used" the property "for purposes of a homestead" under Minn. Stat. § 273.124, subd. 1(a).

A homestead is a person's primary residence.[6]  *See Homestead*, *Black's Law Dictionary* (11th ed. 2019) (defining homestead as "[t]he house, outbuildings, and adjoining land owned and occupied by a person or family as a residence"); Minn. Stat. § 256D.35, subd. 9 (2022) (defining homestead in the Minnesota Supplemental Aid Act as "a shelter in which the individual . . . has an ownership interest, and that is the principal residence of the individual"); *Hatcher v. Comm'r of Revenue*, No. 2212, 1977 WL 957, at *3 (Minn. T.C. Apr. 22, 1977) (citing several opinions of the state attorney general and noting that "[e]ver since the initial passage of the property tax homestead exemption in 1933, the term 'homestead' in that statute has been construed to mean the place occupied by a person as his home or place of abode"), *rev'd on other grounds*, 266 N.W.2d 501 (Minn. 1978).  Thus, to satisfy the third part of the test, the taxpayer must prove that the

---

can still qualify for homestead status for a portion of the year.  Minn. Stat. § 273.124, subd. 9 (2022).

[6]      A property also qualifies as a homestead if it is occupied and used by certain relatives of the owner.  *See* Minn. Stat. § 273.124, subd. 1(c) (2022).  As a result, multiple residential properties owned by the same person could simultaneously claim the homestead classification.  In this case, Vasko claims her son lived at the property when not at college, but the only evidence she introduced to support that claim was an affidavit from her son— which was not admitted for the truth of the matter asserted—and her testimony, which the tax court did not find credible.

residence was occupied and used as the taxpayer's (or the taxpayer's relative's) primary residence.[7]

Vasko argues that the County improperly considered her absences from the property (because she is gone for weeks or months at a time for work) in its decision to revoke her homestead classification. The tax court, however, did not base its decision on whether Vasko was or was not absent from the property for work-related reasons. Instead, the tax court found that Vasko had not proven by a preponderance of the evidence that she lived at the property during the times she claims. Accordingly, the question before us is whether the tax court's factual determination that Vasko and her son did not occupy and use the property as a primary residence in 2019 is clearly erroneous. *Enbridge Energy, Ltd. P'ship*

---

[7] The tax court has held that a home could possibly be occupied and used as a homestead by someone who has not been present at the home for a year or more. *See Sayles v. County of Cottonwood*, No. 17-CV-08-282, 2009 WL 4035666, at *4 (Minn. T.C. Nov. 20, 2009). The tax court reasoned:

> This Court has found that temporary absence when a homestead has already been established does not necessarily negate homestead classification. We have consistently granted homestead status when taxpayers were Minnesota residents who intended to return to their houses and were absent from their homes due to jobs, incarceration, travel, or other reasons. An absence of less than a year where the owner intends to return and has not leased out the property is permissible. An absence of four years may be too long.

*Id.* (footnotes omitted); *see also Cocchiarella v. Driggs*, 884 N.W.2d 621, 627 (Minn. 2016) (discussing what it means to "occupy" a residence and holding that an individual who was not physically present in an apartment could still bring an unlawful removal or exclusion petition). We have never addressed the question and Vasko does not cite *Sayles*. Based on how we resolve this case, we do not need to reach this question today.

*v. Comm'r of Revenue*, 945 N.W.2d 859, 868 (Minn. 2020) (stating that we "review the tax court's factual findings for clear error").

"The tax court's decision is clearly erroneous if the decision is not reasonably supported by the evidence as a whole." *Cont'l Retail, LLC v. County of Hennepin*, 801 N.W.2d 395, 398 (Minn. 2011). In other words, on appeal, our task is not to reweigh the evidence or to consider whether there is sufficient evidence in the record to support Vasko's version of events. *See Macy's Retail Holdings, Inc. v. County of Hennepin*, 899 N.W.2d 451, 457 (Minn. 2017). We simply determine whether there is sufficient evidence in the record to support the tax court's conclusion that Vasko and her son did not use the property as their primary residence in 2019.

Vasko argues that the tax court clearly erred based on (A) water bills, (B) letters from Vasko's attorneys, (C) mail (i.e., envelopes addressed to the subject property), and (D) other procedural and evidentiary arguments. These are addressed in turn below.

A.

At trial, the County produced water bills that show no measurable water use at the property from March 2016 through June 2022. The tax court order noted that, based on testimony from a city official, the metering system measures "for each 1,000 gallons of water used. In other words, the water metering system cannot detect 999 gallons or less of water used." *Vasko*, 2022 WL 17747905, at *2 n.11. The same city worker testified that

12

the average single adult in Lester Prairie uses about 2,000 gallons of water per month.[8] The tax court reasoned that "[a]lthough Ms. Vasko and her son need not show they each used 2,000 gallons of water per month, especially since Ms. Vasko testified they were not at the subject property year-round, the court would anticipate at least some measurable water usage during the subject year." *Id.* at *4.

Vasko provides several explanations for why the water meter was not reflecting water usage. Before the tax court, she argued that the lack of water usage was because water was shut off at the property for extended periods of time.[9] During the shutoffs, however, she claimed that she still lived at the property; she simply "brought in water from other sources to live there."[10] She also argues that she lived at the property in 2019 but used very little water—less than 1,000 gallons per month—so the meter did not register

---

[8]     For the first time on appeal, Vasko challenges the typical water usage figure provided by the City. She asserts that lower figures are supported by a study from the United States Environmental Protection Agency and City records of other residents. By not raising this argument before the tax court, Vasko has forfeited it on appeal. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988).

[9]     Before the tax court, Vasko suggested that the water shutoffs were for extended periods of time, testifying that "then we didn't have water after almost a year and a half." In her brief to this court, she states that water outages were only "a couple of days" in 2019. In any event, this statement does not explain the lack of water usage for all of 2019.

[10]     Vasko testified in detail on this point. She stated that "[w]hen we didn't have water we went to the laundromat for washing clothes, sponge bathing, going to family members to shower a lot." She also stated that every time she or her son used the bathroom they "would just pour a gallon of water in the tank of the toilet."

her actual usage.[11] The tax court did not find these claims credible and we defer to the tax court's credibility determinations.

Before us, Vasko changes course and claims that her water was only shut off for short periods of time and that the water meter was not measuring water usage because it was broken. This assertion is unsupported by the record.[12]

B.

Three letters from attorneys representing Vasko were entered into evidence. The first letter, dated September 12, 2018, states that Vasko moved out of the house in the fall of 2014 and that water was shut off at the property on or about April 12, 2016.

The second letter was dated eight days later—September 20, 2018—and was allegedly sent to the City, although the City never received it. The letter retracts the statements in the first letter and asserts that Vasko was still living at the property.[13]

---

[11] The record does not definitively reveal whether the water meter would detect 1,000 gallons of water use spread across multiple months.

[12] One exhibit shows that the water meter at the property was replaced in 2022, but it nowhere states why the meter was replaced. Vasko also points to documents that she submitted to this court but which were not entered into evidence at trial. "An appellate court may not base its decision on matters outside the record on appeal, and may not consider matters not produced and received in evidence below." *Thiele*, 425 N.W.2d at 582–83.

[13] The tax court admitted this letter under Minn. R. Evid. 801(d)(1), which allows the admission of hearsay evidence if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination." The attorney who wrote the letter did not testify in this case, making that rule inapplicable. The County did not challenge the tax court's evidentiary ruling on appeal. In any event, admission of the letter was harmless because, as discussed below, the tax court did not "place any weight" on the letter and ultimately found in the County's favor.

The third letter was sent to the McLeod County Assessor's Office and was dated January 3, 2020. It stated that "Ms. Vasko informs the undersigned firm that she owns and resides in the property . . . in Lester Prairie" and that "[a]ttached herein are bills from Xcel Energy and Centerpoint Energy, showing charges for services rendered to the property in question." The energy bills described were not admitted into evidence.

The tax court did "not place any weight on" the three letters because they "(a) originated from her lawyers and (b) simply reiterate Ms. Vasko's litigation position." *Vasko*, 2022 WL 17747905, at *5. Simply put, these letters are hearsay. The tax court entered them into evidence for purposes other than to prove the truth of the matter asserted. As such, the contents of the letters—which have not been verified elsewhere in the record—do not establish that the tax court's finding (that Vasko and her son did not use the property as a homestead) was clearly erroneous.

C.

Vasko introduced into evidence 24 pieces of mail—most of them addressed to the subject property.[14] She argues that the fact that she receives mail there proves that she occupies the property. The tax court reasoned that this evidence did not establish occupancy or use of the property because Vasko admitted under cross-examination that the property does not have a mailbox and that mail with the property's address was actually routed to her post office box.

---

[14] Sixteen of the pieces of mail are addressed to the subject property, three are addressed to Vasko's post office box, and five are addressed both to the property and the post office box.

Four of the documents are the property's energy bills for April, May, November, and December 2019. Vasko argues that the energy bills prove that she occupied the property. But these bills do not definitively show that the property was used as a homestead because many homeowners will keep heat on to prevent damage to a home or keep lights on timers for security purposes, even if it is unoccupied.

Relatedly, Vasko argues in her brief to this court that "you cannot have a Post Office Box in Lester Prairie if you don't live there. The Post Office is very strict about this and you have to show proof (more than one) that you live there." This assertion is not supported by the record.

D.

Vasko points to several other pieces of evidence that, in her view, show that she used the property as a homestead. For instance, she argues that the fact that she has consistently paid for garbage service shows that she uses and occupies the property. The tax court noted that Vasko's "garbage services were operational throughout 2019," but determined that paying for garbage service does not, on its own, establish occupancy. *Vasko*, 2022 WL 17747905, at *4.

At trial, the County Appraiser testified that when she went to view the property on successive occasions "nothing moved, I noticed no change" and that "[t]here may have been some tire prints in the driveway, but there [were] never footprints going to the house." Vasko argues—without record support and without testifying to this effect—that the lack of footprints was explained by her parking in her garage and not walking outside. But the bare statement that there "may have been" tire prints does not establish that the tax court's

conclusion that Vasko and her son did not own or occupy the property was clearly erroneous. Tire prints outside a home may be evidence that a property is a person's primary residence, but that is far from definitive. A person may visit a property they own but do not occupy.

At trial, Vasko testified that she lived at the property "five [or] six months" in 2019. The tax court did not find this testimony credible and we defer to the tax court's credibility determinations.

In addition, Vasko cites to a February 21, 2020 notarized statement from her son that states that the property has been his primary residence since 2004. Her son did not testify. The tax court admitted the statement "to show what was sent to the County, but not for purposes of the truth asserted." Thus, the notarized statement does not establish occupancy at the property. Similarly, Vasko submitted her driver's license, which lists the property as her address. Although this is some evidence of occupying the property, it does not establish that the tax court clearly erred.

Vasko also tries to explain why the homestead application was returned as undeliverable in July 2018, claiming that there was probably a mix-up at the post office.[15] Although the fact that the homestead application was returned undeliverable was the original impetus for the County's revocation of homestead status, it was not central to the tax court's finding that the property was not used as a homestead. Even if a post office box

---

[15] She also argues that she did not receive the homestead application because it was sent to her Biscay address. The record shows that it was sent to the post office box associated with the Lester Prairie property's address.

17

associated with a property is closed, that does not mean the home is unoccupied. Rather, the tax court was unconvinced that Vasko had established occupation, especially because there was no measurable water use at the property.

Vasko raises numerous complaints about how the County reacted when she initially challenged the revocation of the homestead classification.[16] She also complains that one of the county assessors originally scheduled to testify was never called to testify, which denied Vasko the opportunity to cross-examine her. But Vasko had the opportunity to cross-examine the other assessor. And the fact that the County did not call every disclosed witness at trial does not invalidate the outcome. *See Cooper v. California*, 386 U.S. 58, 62, n.2 (1967).

\* \* \*

We now consider whether the record shows that the tax court clearly erred when it affirmed the revocation of Vasko's homestead classification. Some of the evidence Vasko pointed to (e.g., her testimony about living at the property) was not deemed credible by the tax court. We defer to the tax court's assessment on the credibility of the evidence. *See*

---

[16] Vasko claims that she received "absolutely no contact" from the county assessor when the homestead classification was revoked in July 2018. The homestead classification was revoked after the application that was mailed to her was returned as undeliverable. The county assessor reached out via phone, email, and by leaving a tag on Vasko's door. Vasko also complains that the County rejected offers to view the house when no one was home, to view the home with a different adult present, and to receive pictures of the inside of the home. It does not strike us as unreasonable, in establishing that Vasko lived at the property, to require her to be present at the property when the County visited. Finally, Vasko points to difficulties she and the County had in finding a mutually convenient time to schedule an in-person viewing. It may be that an in-person viewing would have established occupancy and use, but Vasko cannot rely on counterfactuals to establish occupancy and use.

18

*Macy's Retail Holdings*, 899 N.W.2d at 457. Some of the evidence she pointed to was hearsay (e.g., letters from her attorneys and the notarized statement from her son) and we do not consider it.

Some evidence introduced by Vasko—mail addressed to the property, energy bills, her driver's license—offers some support for the conclusion that the property was used as a primary residence. The tax court, however, weighed this evidence against the fact that there was no measurable water usage at the property and determined that Vasko had not proved use and occupancy by a preponderance of the evidence.

Our role is not "to reweigh the evidence." *Macy's Retail Holdings*, 899 N.W.2d at 457. We cannot conclude, based on this record, that the tax court clearly erred when it found that the property was not occupied or used for purposes of a homestead in 2019.

### III.

Lastly, we consider whether the tax court erred by upholding the County's assessed value for the property. "We will sustain the tax court's factual findings as to market value unless they are clearly erroneous." *Inland Edinburgh Festival, LLC v. County of Hennepin*, 938 N.W.2d 821, 825 (Minn. 2020). There is "a presumption of validity for the county's assessment." *Ct. Park Co. v. County of Hennepin*, 907 N.W.2d 641, 644 (Minn. 2018) (citation omitted) (internal quotation marks omitted). "[T]o defeat the prima facie validity of the assessment, the taxpayer must offer evidence to invalidate the assessment." *S. Minn. Beet Sugar Coop.*, 737 N.W.2d at 558; *see also Guardian Energy, LLC v. County of Waseca*, 868 N.W.2d 253, 258 n.6 (Minn. 2015) (noting that "[a] county's presumptively

valid tax assessment . . . may be successfully challenged with credible evidence that the assessor's estimated market value is incorrect").

Vasko argues that the assessed value of her property is higher than the actual market value.[17] Minnesota Statutes section 273.11, subdivision 1 (2022), mandates that, with certain exceptions not applicable here, "all property shall be valued at its market value." We generally recognize three approaches to determining the market value of real property:

> (1) the sales-comparison approach, which compares the subject property to similar properties recently sold in actual market transactions; (2) the cost approach, which estimates value by finding the current cost to construct a new facility with the same features as the subject property; and (3) the income approach, which determines the value of income-producing property by capitalizing the income the property is expected to generate over a specific period at a specific capitalization or yield rate.

*Inland Edinburgh Festival*, 938 N.W.2d at 825. Only the sales-comparison approach is at issue here. "The sales-comparison approach, as the title suggests, analyzes and compares the sale price paid for multiple comparable properties in market transactions. . . . Then, adjustments are made to reflect differences between the subject property and the comparable properties." *Id.* at 826–27.

---

[17] Vasko originally brought claims for both over-assessment and unequal assessment. Unequal assessment occurs "when other owners' similarly situated properties are assessed at a lower rate" than the property in question. *Walmart Inc. v. Winona County*, 963 N.W.2d 192, 199 (Minn. 2021). The tax court analyzed the case as an over-assessment case and deemed the unequal assessment claim waived. Vasko's claim could be construed as an unequal assessment claim, but as described below, she failed to establish the market value of the property. Because there is no way to assess the percentage of market value at which the property was taxed without knowing the market value of the property, Vasko cannot show that it was taxed at a higher percentage of market value than other properties in the taxing district.

In *S. Minn. Beet Sugar Coop.*, we explained:

> [T]o meet its burden to overcome the presumed validity of the county's estimated market value, [a taxpayer] need not necessarily put forth evidence that would allow the tax court to determine the market value of the subject property. Rather, [the taxpayer] need only put forth evidence to show that the county's assessed value 'does not reflect the true market value of the property.' . . . [A taxpayer] might meet this burden by, for example, presenting evidence of truly comparable sales that the county had not considered or showing that the county taxed property that is not taxable.

737 N.W.2d at 559–60 (quoting *Gale v. County of Hennepin*, 609 N.W.2d 887, 890 (Minn. 2000)). In other words, to overcome the presumed validity of the County's estimated market value, Vasko did not need to put forth her own valuation of the property, provided she introduced evidence that the County's valuation was incorrect.

At trial, Vasko did not put forth her own valuation of the property or challenge the methodology underlying the County's valuation.[18] Rather, she challenged the assessed value of her property by submitting five property tax statements for other properties in Lester Prairie. Even assuming that the tax-assessed value of those properties could be used

---

[18] Vasko complains that her ability to challenge the County's assessment methodology was limited because the county assessor who testified "came to court very unprepared without the availability of her materials such as her field cards she uses to determine . . . market values of homes." It is true that the assessor did not have her files for the properties Vasko mentioned. The trial was over Zoom and the assessor was working from home. She had her file for the property at issue, but Vasko gave her no notice that she would need access to files for other properties.

Exhibit Lists were due June 6, 2022, and parties were to confer about exhibits beforehand. Vasko never submitted an exhibit list. She first tried to send exhibits on August 15, three days before trial. They were not actually received by the County until approximately 4 a.m. on the morning of trial. The County (and the tax court) nonetheless accepted the exhibits and the assessor testified about them, although the assessor did not have access to her office files to refresh her recollection as to the specific properties listed. In short, it was not the County's fault that the assessor could not testify in greater detail about the properties that Vasko submitted at the eleventh hour.

21

as a proxy for their market value, Vasko did not show that those properties are comparable to the property at issue here. Nowhere in the record does Vasko provide any discussion about the attributes of these homes—age, size, state of repair, or other qualities affecting value. On cross-examination, she admitted that she did not have personal knowledge of their dimensions, age, or condition and admitted that she did not "have any information to determine whether or not the market value of these other properties . . . [were] fair in relation to [her] own property tax values."

Vasko also provided six links to properties on Zillow.com, Realtor.com, and similar websites (although only three of the six properties match the properties for which she provided property tax statements). Although these sites provide estimated values for the properties, these are not the sales values of the properties based on recent transactions. According to the links, only one property had been sold in the seven years preceding trial, but there is no way to verify, based on the information in the record, that the sales price is accurate.[19] Vasko provided a second link to a house that was listed at the time of trial, but the tax court had no way of knowing whether the house would sell at, above, or below the list price.

Moreover, Vasko never explained to the tax court why the only property for which she provided a sale price is in any way comparable to the property at issue here. She tries to add such a comparison in her briefs to us, but as with the sales price, there is no way,

---

[19] According to the Zillow link Vasko provided, this home was sold for $81,000 in 2018, $482,030 in 2021, and $210,000 in 2023 (post-trial). These price fluctuations highlight the hearsay and foundation issues with relying on real estate website links at trial.

based on the record, to verify her descriptions of the properties (which are apparently based solely on website links). Accordingly, the tax court did not clearly err by finding that Vasko did not overcome the presumption that the County's assessed value was accurate.

To be clear, overcoming the prima facie validity of the County's valuation is not a high bar. But without credible evidence that other properties—which are being compared to the instant property to show it is overvalued—are actually similar to the Lester Prairie property, Vasko's challenge must fail.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the tax court.

Affirmed.

HENNESY and GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.